UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVSION

**VOTAR, L.L.C.,**

       Plaintiff,

**vs.**

                                 Case No. 05-60125

**HS R & A, LTD.,**

                                 Hon. John Corbett O'Meara

       Defendant.              Magistrate Judge Virginia M. Morgan

---

Randall J. Gillary (P 29905)             John A. Libby (P 33641)
Kevin P. Albus (P 53668)               Law Offices Of John A. Libby, P.C.
Randall J. Gillary, P.C.                  Attorney for Defendant
Attorneys for Plaintiff                  3150 Livernois, Ste. 118
201 W. Big Beaver Rd., Ste. 1020     Troy, MI 48083
Troy, MI 48084                     (248) 619-1734
(248) 528-0440

---

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

      NOW COMES Plaintiff, Votar, L.L.C., by and through its attorneys, Randall J. Gillary,

P.C., who move this honorable Court for partial summary judgment pursuant to F.R.Civ.P. 56,

for the reasons set forth in the attached brief.  Plaintiff seeks summary judgment with regard to

all issues except for damages.

Respectfully submitted,

s/Kevin P. Albus
Randall J. Gillary, P.C.
201 W. Big Beaver Rd., Ste. 1020
Troy, MI  48084
(248) 528-0440
kalbus@gillarylaw.com
Michigan Bar No. P53668

Date:   November 30, 2006

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVSION**

**VOTAR, L.L.C.,**

       Plaintiff,

**vs.**

                               Case No. 05-60125

**HS R & A, LTD.,**

                               Hon. John Corbett O'Meara

       Defendant.             Magistrate Judge Virginia M. Morgan

---

Randall J. Gillary (P 29905)         John A. Libby (P 33641)
Kevin P. Albus (P 53668)           Law Offices Of John A. Libby, P.C.
Randall J. Gillary, P.C.             Attorney for Defendant
Attorneys for Plaintiff              3150 Livernois, Ste. 118
201 W. Big Beaver Rd., Ste. 1020   Troy, MI  48083
Troy, MI  48084                (248) 619-1734
(248) 528-0440

---

**BRIEF IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

ISSUES PRESENTED ........................................................................................................ iii

INDEX OF AUTHORITIES ............................................................................................ iv

STATEMENT OF RELEVANT FACTS ......................................................................... 1

    Introduction ............................................................................................................... 1

    The Key Terms of The Agreement ............................................................................ 1

    HSRA Seeks To Renegotiate the Exclusive Sales Representative Agreement ......... 5

    Relevant Procedural History ................................................................................... 11

LEGAL ARGUMENT .................................................................................................. 13

    Standard of Review ................................................................................................. 13

    There Was No Agreement to Modify Or Terminate The Exclusive Sales Representative
    Agreement ................................................................................................................ 13

    HSRA Breached the Exclusive Sales Representative Agreement By Hiring Another Sales
    Representative for the North American Territory and By Failing To Pay Any Compensation to
    Votar After March 2003 ......................................................................................... 16

    Votar Is Entitled To Entry Of A Declaratory Judgment Concerning HSRA's Continuing
    Liability For Future Sales Commissions ................................................................ 19

    HSRA Tortiously Interfered With Mr. Lee's Employment Agreement ................... 20

    HSRA Is Liable For Penalty Damages And Attorney Fees Under The Michigan Sales
    Representatives Commission Act Because It Intentionally Failed To Pay The Commissions
    Owed To Votar ....................................................................................................... 22

CONCLUSION .............................................................................................................. 23

CERTIFICATE OF SERVICE ...................................................................................... 25

## ISSUES PRESENTED

I.  The Exclusive Sales Representative Agreement between the parties provided that Votar was to be HSRA's sole and exclusive sales representative in North America for a minimum period of five years, that Votar was to be paid sales commissions on all of HSRA's sales to North American customers, and that Votar was to receive a monthly retainer in any month that the sales commissions did not reach a certain level.  Is Votar entitled to summary judgment on its claims that HSRA breached the Exclusive Sales Representative Agreement where the affidavits, deposition testimony, and documentary evidence clearly demonstrate that HSRA ceased communicating with Votar, hired another sales representative in the North American territory, and discontinued all commission and retainer payments to Votar?

II.  Is Votar entitled to entry of a declaratory judgment concerning HSRA's continuing liability for sales commissions where the Exclusive Sales Representative Agreement expressly provided that Votar would be entitled to receive sales commissions for the life of the part and the life of the program?

III.  Did HSRA tortiously interfere with the Employment Agreement between Votar and Mr. Keon Ho Lee where the Employment Agreement contained non-compete provisions which prohibited Mr. Lee from working as a sales representative for HSRA in North America, where HSRA was aware of the non-compete provisions, and where HSRA induced Mr. Lee to breach the non-compete provisions and accept a position as HSRA's sales representative for the North American territory?

IV.  Is HSRA liable for penalty damages and attorney fees under the Michigan Sales Representatives Commission Act where HSRA has intentionally failed to pay sales commissions to Votar within the time limits prescribed by the Act, and where HSRA's failure to pay commissions was neither accidental nor involuntary?

# INDEX OF AUTHORITIES

**Cases**

*Advocacy Org. v. Auto Club Ins. Assoc.*, 257 Mich. App. 365; 670 N.W.2d 569 (2003) ........... 20

*D'Avanzo v. Wise & Marsac, P.C.*, 223 Mich. App. 314; 565 N.W.2d 915 (1997).................... 20

*Dolenga v. Aetna Casualty & Surety Co.*, 185 Mich. App. 620; 463 N.W.2d 179 (1990).......... 20

*Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71; 443 N.W.2d 451 (1989) ............................... 20, 21

*Kenneth Henes Special Projects v. Continental Biomass Industries, Inc.*, 468 Mich. 109; 659 N.W.2d 597 (2003) .................................................................................................................. 22

*Kiff Contractors, Inc. v. Beeman*, 10 Mich. App. 207; 159 N.W.2d 144 (1968)........................ 19

*Moross Limited Partnership v. Fleckenstein Capital, Inc.*, 466 F.3d 508 (6th Cir. 2006) ........... 13

*Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362; 666 N.W.2d 251 (2003)................................................................................................................................. 13, 15

**Statutes**

M.C.L. 600.2961 .................................................................................................................. 22

**Other Authorities**

Black's Law Dictionary (7th ed. 1999)...................................................................................... 16

**Court Rules**

F.R.Civ.P. 56........................................................................................................................ 13

**Treatises**

13 Williston on Contracts, § 39:3 (4th ed.)............................................................................... 19

iv

**STATEMENT OF RELEVANT FACTS**

**Introduction**

This case involves a dispute over sales commissions.  Plaintiff, Votar, L.L.C. (hereinafter "Votar"), is an independent sales representative firm in the automotive industry.  Defendant, HS R&A, Ltd. (hereinafter "HSRA"), is a manufacturer of automotive parts.  HSRA is a South Korean company with factories located in South Korean and in Alabama.

In 2001, Votar and HSRA entered into an Exclusive Sales Representative Agreement pursuant to which Votar was to be HSRA's sole and exclusive sales representative for the North American territory for at least five years.  HSRA agreed to pay sales commissions to Votar on all of its sales, whether direct or indirect, to customers located in North America.  HSRA also agreed not to sell its products in North America through any other sales representatives.

In 2002, after it became apparent that Votar would be successful in procuring substantial new business, HSRA sought to renegotiate the terms of the Agreement.  Among other things, HSRA sought to: 1) reduce the commission rates; 2) eliminate Votar's exclusivity; and, 3) shorten the term of the Agreement.  After months of negotiation, the parties were not able to reach an agreement to modify or terminate the Exclusive Sales Representative Agreement.  In January 2003, HSRA cut off communications with Votar, and hired away one of Votar's key employees, Mr. Keon Ho Lee, as its new sales representative in North American.  In doing so, HSRA breached the Exclusive Sales Representative Agreement and tortiously interfered with the written Employment Agreement between Votar and Mr. Lee.


**The Key Terms of The Agreement**

The terms of the relationship between Votar and HSRA are governed by the written Exclusive Sales Representative Agreement executed by the parties on April 9, 2001.  See Exhibit

1

A.  The Agreement begins by defining the "Territory" as "North America, including but not limited to, United States, Canada and Mexico".  See Exhibit A, p. 1.  The "Recitals" of the Agreement continue with HSRA's express recognition "that Votar has the necessary skills and experience, contacts, goodwill and marketing expertise necessary for Votar to promote the development, marketing and sale of [HSRA's] products in the Territory", and then sets forth HSRA's intention to retain Votar as its sole and exclusive sales representative:

> WHEREAS, [HSRA] is desirous of appointing and retaining Votar as its sole exclusive sales representative in the Territory to solicit orders of and promote the sales of its products in this Territory . . . .

*Id.*  This is followed by § A of the Agreement, wherein HSRA expressly appointed Votar as its sole authorized and exclusive sales representative in North America:

> A.  <u>Appointment as Exclusive Sales Representative</u>
>
> 1.      [HSRA] appoints Votar as its sole authorized and exclusive representative to solicit orders of and promote the sale of its products in the Territory.

See Exhibit A, § A.

The Agreement also made it clear that Votar was to be HSRA's **only** sales representative for North America, and that Votar was to be paid sales commissions on **all** of HSRA's sales in North America:

> C.  <u>[HSRA's] Duties</u>
>
> 1.      [HSRA] agrees to refer to Votar any and all correspondence, inquiries, solicitations and orders pertaining to the sale of its products in the Territory.  In the event of any direct or indirect sale by [HSRA] of its products in the Territory, Votar shall be entitled to its normal commission(s) under this Agreement for such sale.  [HSRA] agrees not to sell its products in the Territory through any other sales representative.

See Exhibit A, § C.

With regard to sales commissions, the Agreement provided that the only sales upon which Votar would not receive commissions were "carry over" sales originated outside of the U.S. and sales to Mando Machinery and Halla Climate Control:

> D.  Compensation
>
>> 1.      Commissions
>
> [HSRA] agrees to compensate Votar at the following commission rates for any and all products sold by [HSRA] in the Territory, as a result of, in whole or in part, the activities or services performed by Votar under this Agreement.
>
>> The business which Votar cannot collect commissions is as follows:
>
>>> 1)  Votar will not be paid commission on carry over business which is used in the territory, but has originated outside of the North American market.
>
>>> 2)  Votar will not be paid commission for business [HSRA] has with Mando machinery and Halla Climate control which originates and is used within the territory.

See Exhibit A, § D.1.  The Agreement also set forth a schedule for the payment of sales commissions at the following rates:

| Sales | Commission Rate |
|---|---|
| First $10,000,000 per year | 4.0% |
| Second $10,000,000 per year | 2.5% |
| Any sales in excess of $20,000,000 per year | 2.0% |

*Id.*

In addition to sales commissions, the Agreement required HSRA to pay a Monthly Sales Development Retainer Fee to Votar in the amount of $3,000 per month.  See Exhibit A, § D.4. This retainer fee was to be paid to Votar in any month in which the total amount of sales commissions payable to Votar was less than $3,000.  *Id.*

The Agreement also provided for an initial term of five years:

3

E.  <u>Term and Termination</u>

1.    This Agreement shall be for a period of five (5) years (the "Initial Period") from the effective date of this Agreement indicated herein. This Agreement shall be automatically renewed for additional successive five (5) year periods (the "Renewal Period") unless either party provides the other written notice not less than ninety (90) days prior to the expiration of the Initial Period and any subsequent Renewal Period(s) indicating its desire to terminate the Agreement at the end of the Initial Period and any Renewal Period.

See Exhibit A, § E.  Although the Agreement included provisions for early termination by written notice in the event of certain specifically identified occurrences, with an opportunity to cure, those provisions were never employed by the parties, and are not relevant to this dispute.

In the event of termination, the Agreement expressly provided that Votar would continue to receive full sales commissions for the life of the part with regard to any business for which a purchase order was obtained prior to the effective termination date, as well one-half the normal sales commissions on any business for which a request for quotation was received prior to the termination date:

3.   In the event of a termination of this Agreement as provided herein:

(a) Purchase orders and/or awarded business which are in effect at the time the termination date becomes effective, and purchase orders received thereafter for the same product, program or parts, will be commissionable and payable to Votar calculated as set forth in the Commissions paragraph of this Agreement regardless of the shipment and invoice date for the life of the program and the life of the part.  It is understood by the parties that in the event of termination of this Agreement by either party and for any reason, Votar will be paid one half (1/2) the commission rate as set forth in the Commissions paragraph of this agreement on all order from or deliveries to the Territory in which the issuing of a request for quotation is obtained by Votar prior to the effective date of termination, regardless of the shipment and invoice date for the life of the program and the life of the part . . . .

See Exhibit A, § E.3.a.  The post-termination sales commission rate would be negotiated with regard to any other business Votar was working on at the time of termination.  *Id.*

The Agreement also made its provisions were to apply to any sales made by HSRA's subsidiaries and affiliates:

     I.   Use of Terms

       1.     It is understood that the parties herein shall include, by description and not limitation, the companies and/or associations and any subsidiary, affiliated company or division of the parties.

See Exhibit A, § I.  Finally, the Agreement included a provision requiring that any and all modifications to the Agreement must be set forth in a signed writing in order to be binding:

     K.   Entire Agreement

       1.     It is agreed by both parties that there are no oral or other agreements or understandings between them affecting this Agreement, and that this Agreement constitutes the entire agreement of the parties hereto and may not be amended, modified or changed other than in a signed writing.

See Exhibit A, § K.

**HSRA Seeks To Renegotiate the Exclusive Sales Representative Agreement**

During the first eight months after the execution of the Agreement, Votar spent a substantial amount of time and effort attempting to market and solicit orders for HSRA's products to various customers in the North American automotive market.  These included General Motors, Ford, DaimlerChrysler, Visteon, Delphi, TRW, Bosch, and Dana, among others.  All of these companies indicated that they were not interested in doing business with HSRA, however, because HSRA did not have the ability to demonstrate that its products would consistently meet the engineering and quality specifications necessary to do business in the North American automotive industry.  HSRA had also failed to pass a plant tour/inspection by Ford, which had been arranged by Votar.  These problems were explained to HSRA in a letter from Votar dated January 18, 2002.  See Exhibit B.

In the meantime, Votar continued its efforts to solicit orders for HSRA's products.  Votar continued calling on several of the customers, including Ford.  By the fall of 2002, Votar was successful in procuring opportunities for HSRA to bid on work with at least three customers: Ford, Delphi, and TRW.

On October 9, 2002, while involved in the bidding process relative to a project with Ford, HSRA sent an email to Votar which was an omen of things to come.  HSRA requested Votar to agree to a reduction its sales commission rate on the Ford project to 2%.  See Exhibit C.  The email indicated that reduction was necessary so that HSRA could meet Ford's price target and still break even on the project.  *Id.*

A little more than a week later, HSRA sent Votar a fax indicating that HSRA wished to renegotiate nearly all of the material terms of the Exclusive Sales Representative Agreement. See Exhibit D.  The fax, dated October 18, 2002, indicated that HSRA wished to: 1) eliminate Votar's exclusivity in North America; 2) reduce Votar's sales commission rates to a flat rate of 2%; 3) eliminate the monthly retainer payment to Votar; and, 4) reduce the initial term of the Agreement from 5 years to 3 years.  *Id.*  The fax indicated that HSRA was seeking these changes because some of its newly-hired managers believed that other Korean companies were only paying sales commissions of 2% to 3%, and because the exchange rate between the U.S. dollar and Korean currency had taken an unfavorable turn for HSRA.  *Id.*

On November 1, 2002, Votar sent a letter to HSRA responding to the proposed modification of the Agreement.  See Exhibit E.  Votar indicated that it was open to renegotiation, but it was not willing to accept the drastic changes proposed by HSRA.  Votar indicated that it was not agreeable to reducing the term of the agreement; that it would be willing to give up exclusivity for all of North America if it was allowed to retain exclusivity at certain customers

including the Big 3; that it was willing to consider a new commission schedule with less drastic reductions; and, that it was not agreeable to the elimination of the monthly retainer payment. *Id.* The letter also indicated that if the commission rate reductions were implemented, HSRA would need to assume some of the engineering functions that would normally be performed by Votar. Finally, the letter confirmed that "Votar has pending business at hand with Ford", and HSRA would need to continue to improve its support. *Id.*

HSRA responded by a fax dated November 6, 2002. See Exhibit F. The fax set forth a revised counter-proposal from HSRA. It also confirmed that Votar had previously procured opportunities for HSRA to bid on business with Ford, TRW, and Delphi. *Id.*

On November 18, 2002, Votar sent a letter to HSRA further explaining Votar's position. See Exhibit G. The letter indicated that Votar's annual expenses in soliciting business for HSRA were approximately $160,000 to $190,000, and that Votar would require a commission rate that would allow it to recover its expenses and to make a profit. *Id.* The letter indicated that even with the acquisition of the Ford LS program, it would take several years for Votar to recoup its initial investment in the relationship. *Id.*

On November 19, 2002, Votar received an email response from HSRA confirming receipt of the November 18 letter. See Exhibit H. The email, written by Mr. Harry Kim, requested Votar to provide a more detailed breakdown of its expenses. It also indicated that since the Ford business had been obtained so quickly, Votar should be more willing to accept a reduced commission rate because more business was sure to follow. *Id.* The parties continued to exchange communications concerning a possible modification to the Exclusive Sales Representative Agreement through the end of November 2002. See Exhibit I. However, no agreement was reached with regard to a modification.

In December 2002, the negotiations between the parties shifted to a possible buy-out of the Exclusive Sales Representative Agreement by HSRA.  See Exhibit J.  Under the proposed buy-out, the Agreement would be terminated and HSRA would continue to pay commissions to Votar with regard to the Ford LS business.  The parties also discussed the possibility of Votar's employee, Mr. Keon Ho Lee, going to work directly for HSRA.  The written Employment Agreement between Votar and Mr. Lee prohibited Lee from working for principals under contract with Votar and from engaging in employment competitive to Votar for a period of one year.  See Exhibit K, § 10.  Votar made HSRA aware of Mr. Lee's Employee Agreement and the covenant not to compete.  See Exhibit L – Ulrich Affidavit, ¶ 11.  Nevertheless, on December 16, 2002, while Votar and HSRA were still attempting to negotiate a buy-out, Mr. Lee voluntarily terminated his employment with Votar with no advance notice.  See Exhibit L, ¶ 13.  Mr. Lee essentially abandoned Votar, and his departure was not amicable.  See Exhibit M - Ulrich Dep., pp. 113.

On December 26, 2002, HSRA sent a fax to Votar with another suggestion for terms for a proposed buy-out.  See Exhibit N.  The fax set forth Harry Kim's proposed commission structure, but indicated that it would have to be approved by HSRA's upper management if it was acceptable to Votar.  This clearly indicated that no agreement had been reached with regard to the proposed buy-out as of December 26, 2002.

On December 31, 2002, Votar responded to HSRA's fax via email.  See Exhibit O.  The email contained the following passage indicating that although HSRA's proposal "seemed fair", no agreement had been reached on the commission rate and that a written document would be necessary to formalize any agreement:

> This proposal seems fair to both parties.  We need to have a one page legal
> document releasing [HSRA] and Votar as well as making sure the terms and

> conditions for payment will be enforced once production starts.[1]  If all
> parties agree on the commission rate, then I can get the document for your
> review sometime next week.

See Exhibit O.  On January 3, 2003, HSRA responded with an email directing Votar to prepare a

draft agreement.  See Exhibit P.  The email also indicated that the proposal had not yet been

approved on HSRA's end.  *Id.*

On January 9, 2003, Votar's President, Peter Ulrich, received a rather hostile email from

Votar's former employee, Mr. Lee.  Mr. Lee had commenced employment at HSRA, and the

email indicated that he would be taking over the buy-out negotiation on behalf of HSRA.  It also

indicated that Votar was to have no further contact with Ford.  *Id.*

On January 10, 2003, Votar sent an email to Mr. Kim at HSRA indicating that Votar

would not deal with Mr. Lee regarding finalization of the proposed buy-out. See Exhibit Q.  The

email clearly indicated that the buy-out had yet to be "finalized".  It also indicated that Votar

would not allow Mr. Lee to continue to use Votar's office.  *Id.*  Mr. Kim responded with an

email on January 11, 2003, which indicated that he had yet to receive a draft buy-out agreement

from Votar.  *Id.*

On January 13, 2003, Mr. Lee sent another hostile email to Votar.  See Exhibit R.  In this

email, Lee made it clear that he was the "general manager of [HSRA] Detroit office, responsible

for the sales & marketing, and engineering for the [North American] market."  *Id.*  The email

suggested that since the Exclusive Sales Representative Agreement remained in place, Votar

remained obligated to support HSRA's sales and marketing efforts.  It also clearly indicated that

Votar was still "negotiating" with HSRA for a buy-out of the Agreement.  *Id*.

---

[1] This language further demonstrates that the proposed buy-out was predicated on the start of
production of the Ford LS program parts.  The intention of both parties was that the commissions
on the Ford LS sales would fund any potential buy-out.

On January 22, 2003, Votar submitted a proposed written buy-out agreement to HSRA. See Exhibit S.  The email to which the draft was attached indicated that the draft could be completed when the appropriate part numbers and descriptions were received, and when the purchase orders were received.  *Id.*  Again, the part numbers and purchase orders would be those relating to the Ford LS program.

By February 5, 2003, Votar had not received any response from HSRA.  See Exhibit T. On that date, Mr. Kim responded with a short email indicating that he would review the proposal and get back to Mr. Ulrich.  *Id.*  After that, HSRA essentially ceased all communications with Votar and Mr. Ulrich.

On March 3, 2003, with no progress having been made on the proposed buy-out, Votar sent a letter to HSRA revoking the buy-out proposal.  See Exhibit U.  The letter indicated that Votar had continued to pursue sales for HSRA at TRW, and that Votar stood ready, willing, and able to continue its representation of HSRA, "especially at Ford Motor Company."  *Id.*  The letter also indicated that Votar had learned that the Ford LS program, which was to be the source of the commission payments under the proposed buy-out, had been put on hold and was in jeopardy of being canceled.  *Id.*

HSRA did not respond to Votar for nearly two months.  On April 28, 2003, HSRA sent an email confirming that the Ford LS program would likely be canceled.  See Exhibit V.  The email also disingenuously claimed that Votar had agreed to a buy-out based on the Ford LS program.  *Id.*  On May 2, 2003, Votar responded with an email confirming its earlier revocation of the proposed buy-out.  See Exhibit W.  The email also confirmed that no buy-out agreement had ever been reached by the parties, and that Mr. Lee was acting as HSRA's sales representative at Ford, in violation of the Exclusive Sales Representative Agreement.  *Id.*

10

On May 19, 2003, Mr. Lee sent an email to Votar claiming that HSRA hadn't received Votar's proposal, and requesting Votar to send the proposal again.  See Exhibit X.  This was contradictory to Mr. Kim's email of February 5, 2003, which indicated that he had received the proposal.  Nevertheless, Mr. Lee's email demonstrated that as of May 19, 2003, HSRA still considered the proposed buy-out to be nothing more than a "proposal".

Beginning in approximately December 2002 or January 2003, HSRA discontinued communicating with Votar with regard to correspondence, inquiries, quotations, and other communications received from customers located in North America.  In fact, HSRA quit communicating with Votar with regard to all aspects of the relationship, with the exception of the occasional email concerning the proposed buy-out.  This essentially made it impossible for Votar to continue performing its sales representative duties under the Agreement.  Nevertheless, Votar continued its efforts to solicit new business for HSRA through at least the end of January 2003.

In approximately March 2003, HSRA opened a new plant in Alabama to manufacture weather stripping and hoses for the automotive industry.  See Exhibit Y.  Although the Exclusive Sales Representative Agreement extended to any and all subsidiaries and affiliated companies of HSRA, Votar was never provided with any communications, inquiries, quotations, or other communications relating to the Alabama plant.

**Relevant Procedural History**

On October 29, 2003, Votar filed the instant lawsuit in the Wayne County (Michigan) Circuit Court.  The original Complaint included claims against HSRA for breach of the Exclusive Sales Representative Agreement and tortious interference with the Employment Agreement between Votar and Mr. Lee.  It also included a request for injunctive relief against Mr. Lee, which sought to enforce the non-compete provisions of his Employment Agreement.

Although Mr. Lee and Votar were both considered citizens of Michigan, and complete diversity did not exist, HSRA and Lee removed the case to this Court on November 26, 2003. On September 24, 2004, this Court entered an order remanding the case to the state court on grounds that complete diversity did not exist.[2]  After remand, the state court determined that all of Votar's claims against Mr. Lee were subject to an arbitration agreement.  As a result, all claims against Mr. Lee were dismissed.  Shortly thereafter, HSRA removed the case again.

On August 4, 2005, Plaintiff's First Amended Complaint was filed.  The First Amended Complaint includes the following four counts:

- Count I – Breach of Exclusive Sales Representative Agreement – In this count, Votar alleges that HSRA has breached the Exclusive Sales Representative Agreement by failing to pay all amounts due under the Agreement, and by hiring other sales representatives to solicit business in North America.  Votar is seeking damages for all of the sales commissions it was entitled to receive under the terms of the Agreement, i.e., life of the part sales commissions on all of HSRA's North American sales for which a purchase order or request for quotation was received between April 9, 2001 and April 8, 2006.

- Count II – Declaratory Judgment – In this count, Votar seeks a declaratory judgment concerning HSRA's continuing liability for future sales commissions in accordance with the terms of the Agreement.

- Count III – Tortious Interference with Contract – In this count, Votar seeks damages against HSRA for it tortious interference with the Employment Agreement between Votar and Mr. Lee.

- Count IV – Violation of Michigan Sales Representatives Commission Act – In this count, Votar seeks an award of penalty damages and attorney fees against HSRA.  The Michigan Sales Representatives Commission Act sets time limits for the payment of commissions to terminated sales representatives and imposes penalty damages on principals who intentionally fail to pay commissions within those time limits.  Votar alleges that HSRA intentionally failed to pay commissions within the prescribed time limits.

Votar now moves for partial summary judgment with regard to all issues except for damages.

---

[2] This case was assigned Case No. 03-74809 when it was originally removed by Defendant.

## LEGAL ARGUMENT

**Standard of Review**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law.'" *Moross Limited Partnership v. Fleckenstein Capital, Inc.*, 466 F.3d 508, 515 (6th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986). When faced with a motion for summary judgment, the opposing party must present more than "the mere existence of a scintilla of evidence" to support it position. *Id.* Summary judgment may be rendered on the issue of liability alone where there is a genuine issue as to the amount of damages. F.R.Civ.P. 56(c).

**There Was No Agreement to Modify Or Terminate The Exclusive Sales Representative Agreement**

The first issue upon which Votar seeks summary judgment is whether the parties entered into an agreement to modify or terminate the Exclusive Sales Representative Agreement. All of the correspondence and other documentary evidence clearly indicates that no such agreement was ever reached by the parties. Rather, the documentary evidence shows that the negotiations between the parties never got past the "proposal" stage, and no agreement was ever formed.

In *Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362; 666 N.W.2d 251 (2003), the Michigan Supreme Court addressed the issue of oral modifications to written agreements which contain language requiring amendments or modifications to be in writing. The Court's analysis included the following discussion of Michigan law:

13

[I]t is well established in our law that contracts with written modification or anti-waiver clauses can be modified or waived notwithstanding their restrictive amendment clauses.  This is because the parties possess, and never cease to possess, the freedom to contract even after the original contract has been executed.

However, the freedom to contract does not authorize a party to *unilaterally* alter an existing bilateral agreement.  Rather, a party alleging a waiver or modification must establish a mutual intention of the parties to waive or modify the original contract.  This principle follows from the contract formation requirement that is elementary to the exercise of one's freedom to contract: mutual assent.

Where mutual assent does not exist, a contract does not exist.  Accordingly, where there is no mutual agreement to enter into a new contract modifying a previous contract, there is no new contract and, thus, no modification.  Simply put, one cannot unilaterally modify a contract because by definition, a unilateral modification lacks mutuality.

**The mutuality requirement is satisfied where a modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract.  In meeting this clear and convincing burden, a party advancing amendment must establish that the parties mutually intended to modify the *particular* original contract, including its restrictive amendment clauses such as written modification or anti-waiver clauses.**

Upon proof of an express oral or written agreement, the mutuality requirement is clearly satisfied.  This is because where the parties expressly modify their previous contract, rescission of the terms of the prior agreement is a necessary implication.  By the clear expression of the parties, contradictory provisions in the prior agreement are *waived*.

However, in situations where a party relies on a course of conduct to establish modification, mutual assent is less clear and thus the rescission, or *waiver*, of the original contract's terms is not so evident.  As a result, where course of conduct is the alleged basis for modification, a waiver analysis is necessary.

As we have stated in other contexts, a waiver is a voluntary and intentional abandonment of a known right.  This waiver principle is analytically relevant to a case in which course of conduct is asserted as a basis for amendment of an existing contract because it supports the mutuality requirement.  **Stated otherwise, when a course of conduct establishes by clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms, the requirement of mutual agreement has been satisfied.**

Further, whereas an original contract's written modification or anti-waiver clauses do not serve as barriers to subsequent modification by express mutual agreement, the significance of such clauses regarding the

14

parties' intent to amend is heightened where a party relies on a course of conduct to establish modification. This is because such restrictive amendment clauses are an *express mutual statement* regarding the parties' expectations regarding amendments.

Accordingly, in assessing the intent of the parties where the intent to modify is not express, such restrictive amendment provisions are not necessarily dispositive, but are highly relevant in assessing a claim of amendment by course of conduct. **Any clear and convincing evidence of conduct must overcome not only the substantive portions of the previous contract allegedly amended, but also the parties' express statements regarding their own ground rules for modification or waiver as reflected in any restrictive amendment clauses.**

*Id.* at 372-375 (italics in original; bold print added; citations and footnotes omitted).

Applying the *Quality Products* analysis to the present case, it is clear that there was never any agreement to modify or terminate the Exclusive Sales Representative Agreement. The Agreement specifically provided that it could "not be amended, modified or changed other than in a signed writing." There is no evidence that the parties ever intended to waive this written modification requirement. In fact, the documentary evidence clearly indicates otherwise. In its December 31, 2002 email to HSRA, Votar made it clear that a "legal document" would be necessary to modify the parties' Agreement. See Exhibit O. On January 22, 2003, Votar sent HSRA a written draft of a proposed agreement to terminate the Agreement. See Exhibit S. The January 22 email indicated that the agreement to terminate would need to be "completed". These communications clearly demonstrate that Votar never intended to waive the requirement that all modifications must be in a signed writing.

Even if it could be shown that Votar waived the written modification requirement, HSRA cannot demonstrate through clear and convincing evidence that the parties ever agreed to modify or terminate the Exclusive Sales Representative Agreement. First, there is no signed written agreement indicating the existence of any such modification. Second, the documentary evidence clearly establishes that the negotiations between the parties never got beyond the "proposal"

stage.  All of the communications between the parties in December 2002 and January 2003 speak

in terms of "proposals" and "drafts".  See Exhibits J, N, O, P, Q, R & S.  When Votar forwarded

a draft proposed agreement to HSRA on January 22, 2003, HSRA did not respond.  On March 3,

2003, and again on May 2, 2003, Votar expressly revoked the proposed buy-out the parties had

been discussing.  See Exhibits U & W.  As late as May 19, 2003, HSRA's employee, Mr. Lee,

referred to the buy-out as a "proposal".  See Exhibit X.  And Votar's President, Peter Ulrich,

testified that there was never any agreement to modify or terminate the Exclusive Sales

Representative Agreement.  See Exhibit L – Ulrich Affidavit. ¶ 6 and ¶ 10.

Defendant cannot produce any evidence which indicates that Votar ever agreed or

intended to waive the written modification requirement contained in the Exclusive Sales

Representative Agreement.  Defendant likewise cannot produce clear and convincing evidence

that Votar ever agreed to modify or terminate the Exclusive Sales Representative Agreement.

Accordingly, Votar is entitled to summary judgment regarding any claims or defenses based on

an alleged agreement to modify or terminate the Exclusive Sales Representative Agreement.


**HSRA Breached the Exclusive Sales Representative Agreement By Hiring Another Sales Representative for the North American Territory and By Failing To Pay Any Compensation to Votar After March 2003**

It is also abundantly clear that HSRA breached the Exclusive Sales Representative

Agreement when it hired another sales representative for the North American territory, cut off all

meaningful communications with Votar, and stopped paying the retainer fees and commissions

due under the Agreement.  Black's Law Dictionary defines "breach of contract" as follows:

> **breach of contract.**  Violation of a contractual obligation, either by failing
> to perform one's own promise or by interfering with another party's
> performance.

Black's Law Dictionary 182 (7th ed. 1999).

In the Exclusive Sales Representative Agreement, HSRA made the following promises:

- That Votar would be HSRA's sole authorized and exclusive representative to solicit orders for HSRA's products in North America.  See Exhibit A, § A.1.

- That HSRA would refer to Votar any and all correspondence, inquiries, solicitations, and orders for the sale of its products in North America.  See Exhibit A, § C.1.

- That HSRA would pay sales commissions to Votar on all its sales to the North American territory, whether direct or indirect.  See Exhibit A, § C.1. and § D.1.

- That HSRA would not sell its products in North America through any other sales representative.  See Exhibit A, § C.1.

- That HSRA would pay a monthly retainer of $3,000 to Votar in any month in which the sales commissions due were less than $3,000.  See Exhibit A, § D.4.

- That the Agreement would be in place for a minimum period of five years.  See Exhibit A, § E.1.

- That if the Agreement was terminated, HSRA would continue to pay sales commissions to Votar for the life of the part and life of the program for any sales relating to purchase orders or requests for quotation received during the term of the Agreement.  See Exhibit A, § E.3.(a).; and,

- That the Agreement would apply to any and all of HSRA's subsidiaries and affiliated companies.  See Exhibit A, § I.

HSRA has breached the Exclusive Sales Representative Agreement by failing to perform each and every one of these promises.  In January 2003, HSRA hired Mr. Lee as its sales representative in North America.  See Exhibit R.  This was a direct violation of § A.1. and § C.1. At approximately the same time, HSRA cut off all meaningful communications with Votar.  See Exhibit L – Ulrich Affidavit, ¶ 16.  This was a direct violation of § C.1.  In March 2003, HSRA stopped making the promised monthly retainer payments.  See Exhibit L – Ulrich Affidavit, ¶ 18. This was a direct violation of § D.4.  Later, when North American sales began to occur, HSRA failed to pay any sales commissions to Votar.  This was a direct violation of § C.1, § D.1., and § E.3.  HSRA cannot produce any evidence which indicates that it fulfilled any of these duties or

obligations under the Exclusive Sales Representative Agreement.  As a result, Votar is entitled to judgment as a matter of law that HSRA has breached the Agreement.

It is anticipated that HSRA will attempt to argue that since Votar's efforts prior to the termination did not result in any sales, HSRA is not liable for any sales commissions.  HSRA's argument is apparently based on the following language from § D.1. of the Agreement:

> [HSRA] agrees to compensate Votar at the following commission rates for any and all products sold by [HSRA] in the Territory, as a result of, in whole or in part, the activities or services performed by Votar under this Agreement . . . .

See Exhibit A, § D.1.  HSRA is essentially arguing that since it cut off communications with Votar, hired away Mr. Lee, and terminated the agreement before Votar was able to procure any production business that resulted in sales, HSRA has no liability for sales commissions to Votar.

There are two significant problems with HSRA's argument, however.  First, HSRA's argument ignores other language in the Agreement, particularly § C.1., which expressly provided that Votar would be paid commissions on **all** of HSRA's sales in the territory, whether direct or indirect.  It also ignores the exclusivity provisions of the Agreement and would essentially render them meaningless.  Under HSRA's interpretation, other sales representatives would be free to solicit orders for HSRA's products in North America, and if such sales occurred, Votar would have no claim for commissions because those sales would not be the result of Votar's activities or services.  This is clearly contrary to the exclusivity provisions of the Agreement.

Second, HSRA's argument simply ignores the fact that it was HSRA itself that prevented Votar from procuring any sales under the Agreement.  In January 2003, HSRA stopped communicating with Votar, and hired away one of Votar's key employees, making it virtually impossible for Votar to procure new business.

It is a general principle of contract law that if one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused. This general principle has been referred to as the "doctrine of prevention." Under the doctrine, a contracting party whose performance of his or her promise is prevented by the other party is not obligated to perform, and is excused from any further offer of performance. In turn, the preventing party is not allowed to recover damages for the resulting nonperformance or otherwise benefit from his or her own wrongful acts.

Where a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform, and may not legally terminate the contract for nonperformance. Furthermore, in such a case, the promisor may not invoke the other party's nonperformance as a defense when sued upon the contract.

13 Williston on Contracts, § 39:3 (4th ed.) (copy attached hereto as Exhibit Z). Michigan courts have recognized and applied the "doctrine of prevention". *See, e.g., Kiff Contractors, Inc. v. Beeman*, 10 Mich. App. 207, 210; 159 N.W.2d 144 (1968). HSRA may not use its actions in preventing Votar from procuring any sales as a defense to Votar's claims for breach of contract.

**Votar Is Entitled To Entry Of A Declaratory Judgment Concerning HSRA's Continuing Liability For Future Sales Commissions**

In Count II of the First Amended Complaint, Votar seeks a declaratory judgment concerning HSRA's continuing liability for sales commissions. If HSRA had fully performed the Exclusive Sales Representative Agreement, Votar would have been entitled to continue receiving sales commissions for the life of the part and the life of the program with regard to any of HSRA's North American sales relating to purchase orders or requests for quotations received prior to termination. See Exhibit A, § E.3. The first opportunity HSRA would have had to terminate the Agreement would have been at the end of its initial five-year term, in April 2006. See Exhibit A, § E.1. Since HSRA breached the agreement, however, Votar is entitled to damages equal to the monetary value of the contract had it been fully performed. *D'Avanzo v.*

*Wise & Marsac, P.C.*, 223 Mich. App. 314, 324-325; 565 N.W.2d 915 (1997). In this case, Votar is entitled to entry of a declaratory judgment ordering HSRA to continue paying sales commissions to Votar for the life of the part and the life of the program with regard to any of HSRA's North American sales relating to purchase orders or requests for quotations received prior to April 8, 2006, in accordance with § E.3 of the Agreement.

### HSRA Tortiously Interfered With Mr. Lee's Employment Agreement

Votar is also entitled to judgment as a matter of law that HSRA tortiously interfered with the Employment Agreement between Votar and Mr. Lee. "The elements of tortious interference with a contractual relationship are (1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant." *Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 95; 443 N.W.2d 451 (1989).

> In order to establish tortious interference with a contract or business relationship, plaintiffs must establish that the interference was improper. In other words, the intentional act that defendants committed must lack justification and purposely interfere with plaintiffs' contractual rights or plaintiffs' business relationship or expectancy. The "improper" interference can be shown either by proving (1) the intentional doing of an act wrongful per se, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiffs' contractual rights or business relationship.

*Advocacy Org. v. Auto Club Ins. Assoc.*, 257 Mich. App. 365, 383; 670 N.W.2d 569 (2003). In the context of a tortious interference claim, "improper" means "illegal, unethical, or fraudulent". *Dolenga v. Aetna Casualty & Surety Co.*, 185 Mich. App. 620, 626; 463 N.W.2d 179 (1990).

Although a defendant's acts in furtherance of a legitimate business interest may be shielded from liability in some circumstances, "the fact that certain actions are taken with the intent that they inure to the personal or pecuniary benefit of the defendant cannot, per se, . . . weave a broad and impenetrable blanket of immunity from liability for those actions." *Jim-Bob,*

*Inc., supra* at 96. "A defendant may not, with impunity, sabotage the contractual agreements of others, and that defendant's cry that its actions were motivated by purely business interests cannot, standing alone, operate as a miracle cure making all that was wrong, right." *Id.*

In the present case, the Employment Agreement between Votar and Mr. Lee had an initial term of four years, from November 2, 1999 through November 1, 2003. See Exhibit K, § 3. The Employment Agreement also contained non-compete provisions which prohibited Mr. Lee from representing the principals under contract with Votar after the termination of the Employment Agreement, and from competing with Votar for a period of one year after termination of the Employment Agreement. See Exhibit K, § 10. During the negotiation of the proposed buy-out between Votar and HSRA, while the parties were discussing HSRA's potential employment of Mr. Lee, Peter Ulrich informed HSRA of the non-compete provisions in Mr. Lee's Employment Agreement. See Exhibit L, Ulrich Affidavit, ¶ 11.

Notwithstanding its knowledge of the non-compete provisions, in January 2003, HSRA hired Mr. Lee as its "general manager of [HSRA's] Detroit office, responsible for sales & marketing and engineering for the [North American] market." See Exhibit R. This was clearly an intentional act by which HSRA interfered with the Employment Agreement between Votar and Mr. Lee. HSRA was aware that Mr. Lee would be violating the non-compete provisions of the Employment Agreement. HSRA was also clearly aware that by hiring Mr. Lee as its North American sales representative, HSRA was violating the exclusivity provisions of the Exclusive Sales Representative Agreement with Votar. HSRA's conduct was clearly unethical, and was clearly done for the purpose of invading Votar's contractual relationship with Mr. Lee. Accordingly, Votar is entitled to judgment as a matter of law that HSRA tortiously interfered with the Employment Agreement between Votar and Mr. Lee.

**HSRA Is Liable For Penalty Damages And Attorney Fees Under The Michigan Sales Representatives Commission Act Because It Intentionally Failed To Pay The Commissions Owed To Votar**

Finally, Votar is entitled to summary judgment of its claims for penalty damages and attorney fees under the Michigan Sales Representatives Commission Act, M.C.L. 600.2961. The Act requires principals to pay sales representatives all commissions which are due at the time of termination within 45 days after termination, and to pay any commissions which become due after termination within 45 days after such commissions become due. M.C.L. 600.2961(4). A principal who intentionally fails to pay commissions within these time limits is liable not only for the overdue commissions, but also for penalty damages equal to two times the overdue commissions, or $100,000, whichever is less. M.C.L. 600.2961(5). When a sales representative pursues a claim under the Act, the prevailing party is entitled to recover reasonable attorney fees and court costs. M.C.L. 600.2961(6).

In *Kenneth Henes Special Projects v. Continental Biomass Industries, Inc.*, 468 Mich. 109; 659 N.W.2d 597 (2003), the Michigan Supreme Court made it clear that the alleged existence of a "good faith" dispute by the principal over whether or not the commissions are actually due will not provide a defense to claim for penalty damages under the Act:

> [U]nder the clear language of the statute, if a principal deliberately fails to pay a commission when due, it is liable for double damages under the statute, even if the principal did not believe, reasonably or otherwise, that the commission was owed. There is no textual indication that a principal's good faith belief is relevant in making the determination that double damages are payable under the statute.

*Id.* at 114. "[T]he only cognizable defense to a double-damages claim is if the failure to pay the commission were based on inadvertence or oversight." *Id.* at 118.

Under the terms of the Exclusive Sales Representative Agreement, HSRA was required to pay sales commissions to Votar "on or before the twenty-fifth (25th) day of each month after

receipt by [HSRA] of payment for the sale of its products."  See Exhibit A, § D.3.  It is undisputed that HSRA has never made any sales commission payments to Votar in this case. See Exhibit L, Ulrich Affidavit ¶ 19.  HSRA's decision to withhold the sales commissions from Votar was not the result of inadvertence or oversight.  HSRA first undertook a campaign to significantly reduce the amount of its sales commission liability to Votar, and when Votar would not accept the reduced commission rates, HSRA abandoned its contractual obligations to Votar and hired a new sales representative.  HSRA's decision to stop paying Votar was clearly intentional.  Accordingly, Votar is entitled to summary judgment with regard to its claim for penalty damages and attorney fees under the Michigan Sales Representatives Commission Act.

**CONCLUSION**

Votar moves this honorable Court for summary judgment in its favor with regard to all issues expect for damages.  The affidavits, documentary evidence, and deposition testimony clearly demonstrate that HSRA breached the Exclusive Sales Representative Agreement when it cut off communications with Votar, hired another sales representative for the North American territory, and discontinued its retainer and commission payments to Votar.  The evidence also clearly demonstrates that there was never any agreement between the parties to modify or terminate the Exclusive Sales Representative Agreement.  As a result, Votar is entitled to judgment as a matter of law that it is entitled to receive sales commissions for the life of the part and life of the program with regard to any of HSRA's North American sales relating to purchase orders or requests for quotation received during the initial five year term of the Agreement.

Votar is also entitled to judgment as a matter of law that HSRA tortiously interfered with the Employment Agreement between Votar and Mr. Lee.  The Employment Agreement

prohibited Mr. Lee from working as a sales representative for HSRA in the North American territory, and HSRA was aware of that prohibition. Nevertheless, HSRA hired Mr. Lee as its sales representative for North America. HSRA's actions were intentional, unethical, and were clearly undertaken for the purpose of improperly interfering with Votar's contractual relationship with Mr. Lee. Accordingly, Votar is entitled to summary judgment on Count III of the First Amended Complaint.

Finally, Votar is clearly entitled to penalty damages and attorney fees under the Michigan Sales Representatives Commission Act. HSRA intentionally withheld all commission payments from Votar. HSRA's failure to pay commissions was not the result of inadvertence or oversight. Accordingly, Votar is entitled to summary judgment with regard to Count IV.

The only issues upon which Votar is not requesting summary judgment at this time are the issues of damages. Although HSRA has been ordered to produce information and documents identifying its sales to North American customers for a portion of the time period at issue, it has failed to do so. As a result, Votar is unable at this time to calculate the amount of sales commissions due. Votar anticipates filing a subsequent motion for summary judgment as to damages after the court-ordered discovery has been produced.

> Respectfully submitted,
>
> s/Kevin P. Albus
> Randall J. Gillary, P.C.
> 201 W. Big Beaver Rd., Ste. 1020
> Troy, MI  48084
> (248) 528-0440
> kalbus@gillarylaw.com
> Michigan Bar No. P53668

Date:   November 30, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2006, I electronically filed the foregoing paper with

the Clerk of the Court using the ECF system which will send notification of such filing to the

following:

John A. Libby (P 33641)
Law Offices of John A. Libby, P.C.
3150 Livernois, Ste. 118
Troy, MI  48083
(248) 619-1734
jalibby@jalibby.com


                                        s/Kevin P. Albus
                                        Randall J. Gillary, P.C.
                                        201 W. Big Beaver Rd., Ste. 1020
                                        Troy, MI  48084
                                        (248) 528-0440
                                        kalbus@gillarylaw.com
                                        Michigan Bar No. P53668