NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 10a0172n.06

No. 08-2316

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED
Mar 18, 2010
LEONARD GREEN, Clerk**

| | |
|---|---|
| VOTAR, L.L.C., | ) |
|     Plaintiff-Appellee, | ) ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR EASTERN DISTRICT OF MICHIGAN |
| v. | ) |
| HS R AND A COMPANY, LTD., | ) |
|     Defendant-Appellant. | ) **OPINION** |

Before: ROGERS, COOK, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Defendant Hwaseung Rubber Automotive Co., Ltd. ("HSRA"), a car parts manufacturer, appeals from the district court judgment entered on a jury verdict in favor of plaintiff Votar, L.L.C. ("Votar"), an independent sales representative company, and from the district court's denial of its motion for judgment as a matter of law or, in the alternative, for a new trial. HSRA asserts that under the unambiguous terms of the contract on which Votar's claims are based, no breach occurred, and further, certain sales were erroneously included in the calculation of damages. We affirm.

**Background**

**A. HSRA and Votar Enter into a Contract**

HSRA is a South Korean company that manufactures hoses, tubes and weatherstripping for Korean and foreign automotive manufacturers. In 2000, HSRA decided to attempt to sell its

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

products to automotive companies in the United States, and to assist in this, on April 9, 2001, HSRA entered into an "Exclusive Sales Representative Agreement" ("ESRA") with Votar.

Pursuant to the ESRA, Votar became the "sole and exclusive sales representative to solicit orders of and promote the sale of" HSRA's, and any of its subsidiary's, products in the United States, Canada and Mexico for a period of five years. A section of the Agreement titled "The [HSRA]'s Duties" reads, in part:

> 1. The [HSRA] agrees to refer to Votar any and all correspondence, inquiries, solicitations and orders pertaining to the sale of its products in the Territory. In the event of any direct or indirect sale by [HSRA] of its products in the Territory, Votar shall be entitled to its normal commission(s) under this Agreement for such sale. The [HSRA] agrees not to sell its products in the Territory through any other sales representative.

The ESRA provides for two forms of remuneration for Votar's services: a variable rate commission of between 2% and 4% of sales, and a monthly retainer fee of $3,000. It also provides that Votar would not receive commissions on any HSRA "carry over business which is used in the territory, but has originated outside of the North America market," and contains an integration clause.[1]

---

[1] Section "D" of the Agreement covers compensation and reads, in its entirety:
D.  Compensation
    1. Commissions
    The [HSRA] agrees to compensate Votar at the following commission rates for any and all products sold by the [HSRA] in the Territory, as a result of, in whole or in part, the activities or services performed by Votar under this Agreement.

    The business [on] which Votar cannot collect commissions is as

- 2 -

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

> follows;
> 1) Votar will not be paid commission on carry over business which is used in the territory, but has originated outside of the North America market.
> 2) Votar will not be paid commission for business [HSRA] has with Mando machinery and Halla Climate control which originates and is used within the territory.
>
> (a)  A commission of four percent (4%) is to be paid to Votar on the initial Ten Million Dollars ($10,000,000.00) of sales each year. The calculation of this commission structure ($10,000,000.00 x 4%) will be applied on the initial Ten million Dollars ($10,000,000.00) in sales attained from January 1st to December 31st of each year.
> (b)  A commission of 2.5 percent (2.5%) is to be paid to Votar on sales between Ten Million Dollars ($10,000,000.00) and Twenty Million Dollars ($20,000,000.00) of each year. The calculation of this commission structure {($20,000,000.00 - $10,000,00.00 [*sic*]) x 2.5%} will applied [*sic*] on the sales attained from January 1st to December 31st of each year.
> (c)  A commission of two percent (2%) is to be paid to Votar for all remaining sales in excess of 20 Million Dollars ($20,000,000.00) for each year. The calculation of this commission structure {(Total annual sales volume - $20,000,000.00) x 2.0%)} is for sales attained from January 1st to December 31st of each year.

2. The [HSRA] and Votar agree that the commission rates described above may be modified upon such terms and conditions only as mutually agreed upon in writing signed by both parties. Any modification of commission rates will only be applicable to prospective sales, and will not be applied retroactively.

3. The [HSRA] agrees to pay Votar its commissions by wire transfer on or before the twenty-fifth (25th) day of each month after receipt by the [HSRA] of payment for the sale of its products.

4. Monthly Sales Development Retainer Fee

> In consideration of and compensation for Votar's services, the [HSRA] agrees to pay Votar a Monthly Sales Development Retainer Fee (the "Fee") in the amount of Three thousand Dollars ($3,000.00) per month upon the following terms and conditions:

- 3 -


No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

Although Votar's efforts never successfully procured revenue-generating business for HSRA, HSRA did receive an award to provide parts for a Ford program for production of the Lincoln LS (*i.e.,* the 2006 F236/F237) models in 2003. That program, however, was cancelled by Ford before the sale of parts was consummated.

In October of 2002, HSRA requested changes to the ESRA, including a reduction in commission percentages to a 2% flat rate, allowing HSRA to contract with other North American independent sellers, eliminating the monthly retainer fee that HSRA paid to Votar, and a reduction in the contract period from five to three years. Peter Ulrich, president of Votar, responded to these

---

(a) The Fee will not be paid to Votar in any month where the total monthly amount of commission described in Paragraph 1 above exceeds the Fee amount;

(b) Payment of the Fee will be reviewed after two (2) years commencing from the effective date of this agreement and will continue each year provided Votar performs its duties such as obtaining a purchase order or develops future promising business opportunities for the [HSRA].

(c) In the event of Votar's business trips to the [HSRA]'s principle place of business located in Korea, the [HSRA] agrees to pay Votar the cost and [*sic*]expense, including, by description and not limitation, the cost of business class airline ticket(s), and lodging provided that Votar obtains [HSRA]'s approval prior to any business trips;

(d) The HS agrees to pay Votar the Fee by wire transfer on or before the Twenty-Fifth (25th) day of each month.

5. Payment of compensation to Votar is to be made in United States currency. Votar agrees to pay any wire transfer charges issued to Votar by Votar's banking institution. All other exchange, interest, banking, collection or other charges are to be for the HS's account upon such terms and conditions as the parties mutually agrees in writing. All other exchange, interest, banking, collection or other charges are to be for the HS's account upon such terms and conditions as the parties mutually agree in writing.

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

requested changes on November 1, 2002 with a counter-proposal. Negotiations between Votar and HSRA regarding amending the ESRA continued through approximately the end of November 2002. While HSRA and Votar were negotiating amending the ESRA, HSRA entered into discussions to hire Votar employee Keon Ho Lee ("Lee"). Lee ultimately resigned from Votar on December 16, 2002, and began working for HSRA on January 1, 2003, as the general manager of HSRA's Detroit office.

In December of 2002, the negotiations to amend the ESRA became negotiations for HSRA to "buy-out" the ESRA. The buy-out the parties were considering would have provided Votar with a percentage commission on sales of HSRA products to Ford under the Lincoln LS program, which sales were still anticipated at the time.

On December 28, 2002, Ulrich sent HSRA's manager for its overseas division, Harry Kim ("Kim"), an email that requested: "Please let me know of [HSRA]'s final position as I verbally explained over the phone last week, and confirmed by email my final offer." Kim replied that he thought Ulrich had his reply already, and he was re-sending it. Ulrich replied to Kim by email on December 31, 2002, stating in part:

> This proposal seems fair to both parties. We need to have a one page legal document releasing [HSRA] and Votar as well as making sure the terms and conditions for payment will be enforced once production starts. If all parties agree to the commission rate, then I can get the document for your review sometime next week.

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

HSRA claims that the ESRA was terminated by this email. However, Lee admitted in testimony at trial that as of January 27, 2003, there was not a completed contract memorializing the buy-out.[2]

On January 3, 2003, Ulrich sent Kim an email asking:

> Did you receive my latest e-mail? Any answer on your end, so we can move forward? Basically, I said I accept your idea and am waiting your go ahead to draft the buyout letter.

Kim responded that same day, writing: "You may go ahead to make draft. Only [HSRA's president's] approval left."

On January 9, 2003, Ulrich received an email from Lee acting in his new position at HSRA. In the email, Lee stated that he would be handling the buy-out negotiations for HSRA going forward, and asked Ulrich not to contact the Ford Lincoln LS buyer directly to obtain information in reference to the buy-out. On January 10, 2003, Ulrich sent a letter to Kim stating that Ulrich did not wish to work with Lee in finalizing the buy-out because of declining personal relations between himself and Lee due to Lee's departure from Votar. This email also stated that Ulrich would turnover Lee's HSRA documents that were still in Votar's offices "[o]nce the contract is finalized," which language in the context of the paragraph appears to relate to the Ford contract. Ulrich also stated he planned on "honoring the committmet [*sic*] we have both made." Kim replied to this email, and among other

---

[2]On re-direct, Lee claimed he was only stating that the particular document was not a complete agreement, but even if that were so, the fact that edits were still being made to complete an agreement in late January indicates that neither party believed that they had reached a final agreement at that time.

- 6 -

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

things stated "Please make [b]uy off contract draft and send to me. I will inform you all [*sic*] information as soon as the contract completed."

On January 13, 2003, Lee sent an email to Ulrich stating that he was the "general manager of [HSRA's] Detroit office, responsible for the sales & marketing, and engineering for the [North American] market." The email noted that HSRA and Votar were still under contract "even though Votar is negotiating with [HSRA] to buy out the contract in the near future" and requested various documents.

On January 22, 2003, Ulrich sent an email to Kim attaching a proposed buy-out agreement. Ulrich sent another email to Kim on January 24, 2003, asking him to confirm receipt of the draft buy-out agreement. Ulrich sent another email to Kim on February 5, 2003, stating:

> I have not heard from you and I am wondering if we are still on track regarding the buyout draft I supplied over two weeks ago. Please advise me of when I can expect a response from you to close out this issue. This would include the pertinent Ford information to be included in the buyout agreed. I thank you in advance for your help.

Kim replied shortly thereafter by email, stating that he had not had time to review the buy-out agreement, but would send along comments within a week. Ulrich testified that he never received any comments on the draft buy-out agreement from Kim.

In February 2003, Ulrich learned that the Ford purchase that was the basis of the draft buy-out was likely to be cancelled. Because of this, Ulrich sent a letter dated March 3, 2003 to Kim stating that he was revoking the buy-out proposal, and would continue to rely on the ESRA.

- 7 -

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

Votar stipulated at trial that it stopped pursuing business on behalf of HSRA in January 2003, at which time, Votar claims, HSRA stopped communicating necessary business information to it. In March 2003, HSRA stopped paying the monthly retainer fee to Votar.

**B. The Hyundai Account**

Hyundai and HSRA have had a business relationship since 1967. Kim testified that in 2000, in South Korea, he negotiated with Hyundai for HSRA to become a supplier for the Hyundai Sonata and Sante Fe lines of automobiles, and entered into an "implicit agreement" with them to do so. Hyundai asked HSRA and several other suppliers to establish plants in Alabama close to the new Hyundai plant that would be producing the Sonata and Santa Fe vehicles. HSRA began producing parts for the Sonata and Santa Fe programs in its plants in Korea, but then transferred those functions to the Alabama plant once it was constructed. Ulrich testified that the 2001 versions of the Santa Fe and Sonata were different in certain respects from the 2007 versions.

Kim testified that in order to invest the approximately $25 million dollars necessary to construct a plant in Alabama, HSRA sought guarantees from Hyundai regarding the volume of business Hyundai would do with HSRA. Those guarantees were in the form of an October 17, 2003 letter of intent from Hyundai Motor Manufacturing Alabama, L.L.C., stating that HSRA, through its subsidiary in Alabama, Hwaseung Automotive Alabama ("HSAA"), would be a supplier for the Sonata and Santa Fe car lines.

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

In September 2004, HSAA began manufacturing and shipping products to Hyundai Motor Manufacturing Alabama. HSAA also stores, assembles and/or modifies HSRA products produced in South Korea for sale to other car manufacturers in the United States.

**C. The Jury Verdict**

The jury found that (1) the ESRA did not end until April 9, 2006, (2) HSRA had breached the ESRA and was liable to Votar for $3,110,912.49[3] in damages as a percentage of the total sales derived from seven programs for which HSRA was providing parts, (3) HSRA's failure to pay commissions to Votar was intentional, and (4) Votar is entitled to post-termination commissions under the ESRA. The jury did not reach Votar's tortious interference with contract claim premised on HSRA's hiring of Lee, because it awarded Votar full damages on its breach of contract claim.

The court entered judgment on January 2, 2008. It awarded $3,108,698.94 for damages through September 30, 2007, $100,000.00 against HSRA in penalty damages for violating the Michigan Sales Representatives Commission Act, Mich. Comp. Laws § 600.2961(5) (1992)[4], and $705,110.11 in interest through December 20, 2007, plus an additional $596.15 in interest per day

---

[3]This amount was later reduced to $3,108,698.94, after a calculation error was brought to the attention of the court.

[4]The Act states that:
(5) A principal who fails to comply with this section is liable to the sales representative for both of the following:
. . .
(b) If the principal is found to have intentionally failed to pay the commission when due, an amount equal to 2 times the amount of commissions due but not paid as required by this section or $100,000, whichever is less.

- 9 -

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

until entry of judgment, and thereafter interest pursuant to 28 U.S.C. § 1961 until the judgment is paid in full.

After the court entered judgment, HSRA made a second renewed motion for judgment as a matter of law or, in the alternative, for a new trial and/or remittitur. The district court denied the motion. This timely appeal followed.

## Discussion
### A. Standard of Review

Because the district court exercised diversity jurisdiction, this Court reviews the district court's legal determinations in its denial of a judgment as a matter of law under Rule 50(a) or 50(b) *de novo*, while questions of evidence sufficiency will be reviewed as the forum state would review them. *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996). "In Michigan courts, the standard of review for judgments notwithstanding the verdict requires review of the evidence and all legitimate inferences in the light most favorable to the nonmoving party. Only if the evidence so viewed fails to establish a claim as a matter of law, should a motion for judgment notwithstanding the verdict be granted. Hence, we review the denial of judgment as a matter of law under a standard akin to the federal summary judgment standard." *Mannix v. County of Monroe*, 348 F.3d 526, 532 (6th Cir. 2003) (internal citations, quotations and brackets omitted).

The standard of review for a motion for a new trial is abuse of discretion. *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007).

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

## B.  HSRA's Claim That Votar is Not Entitled to Commissions Because it Did Not Participate in Certain Sales is Unavailing

HSRA claims that § C(1) of the ESRA, containing the phrase "[i]n the event of any direct or indirect sale by [HSRA] of its products in the Territory, Votar shall be entitled to its normal commission(s) under this Agreement for such sale," unambiguously refers to the entirety of § D(1) entitled "Commissions," including a sentence that begins that section stating that Votar receives commissions on HSRA products sold "as a result of, in whole or in part, the activities or services performed by Votar under this Agreement."  HSRA claims this is a limiting provision, and because Votar did not obtain any revenue-generating business for HSRA, Votar did not contribute "in whole or in part" to any of the sales and is therefore not entitled to any commissions.

Votar replies that its lack of participation in the sales was the product of HSRA's breaches of the ESRA, which required HSRA to refer to Votar all correspondence, inquiries, solicitations and orders relating to the sale of its products in North America, and to pay sales commissions to Votar on any direct or indirect sales by HSRA in North America, and which prohibits HSRA from selling its products through any entity other than Votar in North America.  As a result, Votar claims, the jury was correct in awarding Votar the commissions it would have received had HSRA not breached the ESRA.  Thus, under Votar's reading, the term "normal commission(s)" refers only to the provisions of § D(1) that delineate Votar's percentage of commission based on volume of sales.

We conclude that the question whether the ESRA was breached was properly put to the fact-finder, the jury had sufficient evidence to reasonably find that the ESRA had been breached, and the

- 11 -

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

jury could have reasonably found that the HSRA's breach was the reason Votar did not participate in the sales.

In a breach of contract action, the plaintiff has the burden of proving that a breach occurred. *Keywell & Rosenfeld v. Bithell*, 657 N.W.2d 759, 790-91 (Mich. Ct. App. 2002). The purpose of damages in a breach of contract action is to put the injured party "in as good a position as he would have been in had defendant kept his contract." *Am. Ass'n of Retired Persons v. National Sur. Corp.*, No. 98-820589-CZ, 2001 WL 1530353, at *15 (Mich. Cir. Ct. Feb. 23, 2001) (unpublished) (quoting *Goodwin, Inc. v. Coe* (supplemental opinion), 233 N.W.2d 598, 602 (Mich. Ct. App. 1975)); *see also* 3 Am. Jur. 2d *Agency* § 261 (2009) (damages for breach of agency contract commonly include commissions expected).

The jury could reasonably have found that Votar was not involved in the sales as a result of HSRA's breach of the ESRA. Even were we to agree with HSRA that its failure to provide commissions to Votar on its sales was not itself a breach of the ESRA, discussed *infra*, there was sufficient evidence for the jury to find breach based on one of the two other grounds advanced by Votar, i.e., HSRA's utilization of in-house sales representatives for the North American territory in violation of § A(1), or HSRA's failure to "refer to Votar any and all correspondence, inquiries, solicitations and orders pertaining to the sale of" HSRA's products in North America in violation of § C(1). As a third potential ground for breach, the district court found that when HSRA "hired Mr. Lee, stopped communicating with Votar, and began informing accounts that Votar was no longer involved" thus "render[ing] impossible Votar's continued performance under the agreement," HSRA

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

also committed breach. *Votar, L.L.C. v. HSR & A, Ltd.,* No. 05-60125, 2008 WL 4239113, at *2 (E.D. Mich. Sept. 11, 2008) (unpublished).

Any of these breaches would have entitled Votar to damages, which at this point, where the sales have already occurred, are reasonably calculated as the commissions Votar would have earned had the ESRA been honored.[5]

HSRA makes the additional argument that the ESRA did not require HSRA to pay Votar commissions on sales that HSRA obtained itself. However, whether the term "normal commission(s)" in § C(1) only entitles Votar to commissions on sales in which it played a role (as opposed to all North American sales) such that HSRA's failure to pay the commissions was itself a breach of the agreement is sufficiently ambiguous in the context of the ESRA as a whole for

---

[5]HSRA appears to claim that the remedy for breach under any theory other than failure to pay commissions would be different. For example, at one point in its Reply Brief, HSRA claims that Votar's remedy for breach on the basis of hiring other sales representatives or failing to refer sales inquiries would be limited to an injunction "requiring [HSRA] to comply with its obligations to refer it any inquiries and to refrain from hiring an alternative sales agent." While an injunctive remedy may have been available at one time, the term of the ESRA has now concluded, and Votar's remedy would be for damages measured as lost commissions. *See Lasala v. Gupta*, No. 283983, 2009 WL 2195102, at *3 (Mich. Ct. App. July 23, 2009) ("[E]quity will not take jurisdiction where there is an adequate and complete remedy at law, as where the account involved is based on a claim which, in effect, is merely for damages for breach of contract . . . .") (quoting *Basinger v. Provident Life & Accident Ins. Co.*, 239 N.W.2d 735, 739 n.21 (Mich. Ct. App. 1976)).

Similarly, HSRA states elsewhere that breach for failure to forward purchase inquiries or the hiring of another sales representative "would have had damages measured by a much smaller number of particular lost sales," but it does not cite any authority for this and it is not clear why this would logically be so. All of HSRA's sales were made after, or involved actions constituting, breach of the contract, under any of the breach theories applied.

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

submission to the jury. This Court has previously summarized Michigan law on contract interpretation:

> In Michigan, the proper interpretation of a contract is a question of law. That contracts are enforced according to their terms is a corollary of the parties' liberty to contract. The goal of contract construction is to determine and enforce the parties' intent on the basis of the plain language of the contract itself. Michigan courts examine contractual language and give the words their plain and ordinary meanings. If the language of the contract is unambiguous, the court construes and enforces the contract as written. If the contract language is ambiguous, testimony may be taken to explain the ambiguity. Only when contract language is ambiguous does its meaning become a question of fact.
> A contract is ambiguous if its words may reasonably be understood in different ways. In other words, a contract is ambiguous when its provisions are capable of conflicting interpretations. Courts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare ambiguity. Instead, contracts must be construed so as to give effect to every word or phrase as far as practicable. However, courts may not impose an ambiguity on clear contract language.

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543-44 (6th Cir. 2007) (internal citations, emphasis & brackets omitted).

HSRA claims that to read the ESRA as requiring HSRA to pay commissions to Votar on all North American sales would render the "in whole or in part" language in § D(1) nugatory, contrary to a canon of contract construction. But this is not necessarily so. That phrase must be read in the context of a scheme set up earlier in the ESRA that arguably makes Votar the only allowed representative of HSRA goods in North America. *See* "The [HSRA]'s Duties," *supra*; *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 781 n.11 (Mich. 2003) ("We read contracts as a whole, giving harmonious effect, if possible, to each word and phrase."); *Roberts v. Titan Ins. Co. (On Reconsideration)*, 764 N.W.2d 304, 315 (Mich. Ct. App. 2009) ("It is a cardinal principle of

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

construction that a contract is to be construed as a whole . . . ."). By the ESRA's terms, Votar was the "sole authorized and exclusive representative to solicit orders of and promote the sale of [HSRA's] products in the Territory," HSRA was required to "refer to Votar any and all correspondence, inquiries, solicitations and orders pertaining to the sale of its products in the Territory," and HSRA "agree[d] not to sell its products in the Territory through any other sales representative."

In that context, the "in whole or in part" language could be interpreted as simply a clarifying clause specifying that, given Votar's sole authority for sales in North America[6], Votar may not be denied a payment on a theory that procuring the sale was not exclusively the work of Votar. Such a reading does not render the "in whole or in part" phrase "meaningless." Nor would such an interpretation constitute the imposition of ambiguity on a contract with clear meaning.

Additionally, because the amount of damages is tied to the commissions Votar would have earned had HSRA not breached the ESRA, HSRA's argument that the damages award is "disproportionate" also must fail.

Therefore, the district court did not err in denying HSRA's motion for judgment as a matter of law, and did not abuse its discretion in denying HSRA's motion for a new trial.

**C.    The ESRA is Ambiguous and Sufficient Evidence Supports a Reasonable Jury Verdict that Votar was Entitled to Damages Based on the Hyundai Sales**

---

[6]Exclusive of the exceptions specifically laid out in § D(1).

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

     HSRA next argues that even if there was breach, there was insufficient evidence for the jury to conclude that the damages calculation should include HSRA's sales to Hyundai, and also that those sales are precluded as "carry over" business under § D(1) of the ESRA. Votar replies that it presented sufficient evidence for the jury to determine that the sales to Hyundai did not "originate" outside of North America and were not "carryover" business, but were in fact sales as to which Votar was entitled to commissions under the ESRA.

     The ESRA states that "Votar will not be paid commission on carry over business which is used in the territory, but has originated outside the North America market." Although the ESRA goes on to specifically exclude other companies by name, Hyundai is not among them. The district court found that HSAA's sales to Hyundai were properly factored into the damages calculation, stating: "Votar presented evidence to the jury that HSAA sales were not carryover business that originated outside North America." Most significantly, this evidence included Hyundai's purchase order, which was sent from its subsidiary in Alabama to HSAA's headquarters in Alabama. Additionally, Votar presented evidence that the Sonata and Santa Fe models had changed since HSRA had first begun providing parts to Hyundai.

     The parties failed to define in the ESRA what constitutes business that "originated outside the North America" market or what was "carry over" business, and thus it was appropriate for the district court to allow that question to go to the jury. While the failure to define a term in a contract does not itself render that term ambiguous, *see Terrien v. Zwit*, 648 N.W.2d 602, 613 (Mich. 2002), because the terms "originate" and "carryover" do not appear to have a standard meaning in this

- 16 -

No. 08-2316
*Votar, L.L.C. v. HS R&A Company, Ltd.*

context, it was appropriate for the jury to make that determination. Thus, HSRA's argument that "[t]he fact that Hyundai issued a letter of intent as a purchase order does not say anything regarding where the relevant business 'originated,'" or that changes in the design of the Sonata and Santa Fe models are irrelevant to this issue, are just one possible view, one which the jury clearly rejected.

The ambiguity of the ESRA was sufficient for the district court to put the question to the jury, and the evidence, seen in a light most favorable to Votar, is sufficient for the jury to reasonably find that Votar was entitled to commissions on those sales.

We AFFIRM.

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Leonard Green | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: March 18, 2010

Mr. Kevin P. Albus
Law Office of Randall J. Gillary
201 W. Big Beaver Road
Suite 1020
Troy, MI 48084

Mr. Troy Douglas Cahill
Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue, N.W.
Robert S. Strauss Building
Washington, DC 20036

Mr. Randall J. Gillary
Law Office of Randall J. Gillary
201 W. Big Beaver Road
Suite 1020
Troy, MI 48084

Mr. Thomas Che Goldstein
Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue, N.W.
Robert S. Strauss Building
Washington, DC 20036

Ms. Michelle Wilkins Johnson
Nelson, Mullins, Riley & Scarborough
201 Seventeenth Street, N.W.
Suite 1700
Atlanta, GA 30363

Won S. Shin

Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue, N.W.
Robert S. Strauss Building
Washington, DC 20036

                Re:  Case No. 08-2316, *Votar, L.L.C v. HS R and A Company, Ltd.*
                      Originating Case No. : 05-60125

Dear Sir or Madam,

   The Court issued the enclosed (Order/Opinion) today in this case.

                                        Sincerely yours,

                                        s/Nancy Barnes
                                        Case Manager
                                        Direct Dial No. 513-564-7022
                                        Fax No. 513-564-7096

cc: Mr. David J. Weaver

Enclosure

Mandate to issue